[Tanner's Executor v. Louisville & Nashville Railroad Co.]

# Tanner's Executor *v.* Louisville & Nashville Railroad Co.

*Action for Damages against Railroad Company for Killing Plaintiff's Testator.*

| | |
|---|---|
| 60 | 621 |
| 93 | 210 |
| 93 | 421 |
| 60 | 621 |
| 94 | 230 |
| 60 | 621 |
| 95 | 408 |
| 60 | 621 |
| 97 | 146 |
| 97 | 239 |
| 97 | 304 |
| 97 | 310 |
| 60 | 621 |
| 98 | 82 |
| 98 | 637 |
| 60 | 621 |
| 103 | 139 |
| 103 | 169 |
| 60 | 621 |
| 108 | 65 |
| 60 | 621 |
| 121 | 248 |
| 60 | 621 |
| 124 | 177 |
| 125 | 218 |
| f125 | 600 |
| 60 | 621 |
| 131 | 279 |
| 60 | 621 |
| 134 | 292 |
| 60 | 621 |
| 136 | 286 |
| 60 | 621 |
| h143 | 369 |
| 143 | 370 |

1. *Care and diligence required of railroad company.*—In the employment of steam as a motive power, railroad companies are held to the exercise of extraordinary diligence—that degree of diligence which very careful and prudent men exercise in the conduct of their own affairs; and this requires that they shall employ very careful and prudent men, and that the persons employed by them shall exercise such care and diligence as very careful and prudent men exercise in the conduct of their own private interests and important enterprises.

2. *Contributory negligence.*—The doctrine of contributory negligence, as a defense to an action for damages on account of injuries caused by a careless or tortious act, has been materially modified, in its application to actions against railroad companies: although the plaintiff may have been at fault in the first instance, in getting on the railroad track, and thus placing himself in a position of peril, yet, if he makes all proper efforts to escape when the danger becomes apparent, and the servants of the railroad company fail to use all the proper means in their power by which the danger might be avoided, the railroad company is responsible for the injury, and the original contributory negligence is no defense to the action.

3. *Same.*—To avoid the defense of contributory negligence, it is not necessary that the wrongful act of the defendant, or its agents and servants, should be "wanton *and* intentional," as erroneously stated in the case of *Government St. Railroad Co v. Hanlon,* 53 Ala. 70: if the injury done be wanton, reckless, or intentional, that defense is overcome.

4. *Same.*—When a person of adult years is seen on a railroad track, in advance of an approaching train, and shows by his actions that he is aware of its approach, and is using the proper efforts to get out of its way, the person in charge of the train is not required to stop it, nor, ordinarily, even to check its speed ; but, if the person be on horseback, on a high embankment, or in a deep cut, from which he probably cannot escape in time, or be suddenly thrown from his horse, and cannot escape, it is the duty of the engineer promptly to use all means in his power to avoid injury, and the company is liable if he fails to do so.

5. *Admissibility of declarations as part of res gestæ.*—The declarations of the servants of the railroad company, while returning to town on the train with the dead body of the deceased, are not admissible evidence against the company, as a part of the *res gestæ* connected with the killing.

6. *Relevancy of evidence, on question of negligence.*—In an action against a railroad company, to recover damages for killing plaintiff's testator while riding on the track, on horseback, the defendant cannot be allowed to prove "that there was danger to employees on the train in running over stock ;" nor that other persons had been notified not to travel on the railroad track.

7. *What witness may state.*—The engineer, in charge of the train at the time the accident happened, cannot be allowed to testify that he used "all the means he had to stop the train," but should state what means he did use.

8. *Same.*—So, he can not be asked, "whether the ground and bearing of the road-bed were such as would have permitted the deceased to escape injury by the locomotive and cars, but for his own conduct," &c.

[Tanner's Executor v. Louisville & Nashville Railroad Co.]

9. *Cross-examination of witness.*—The servants of the railroad company, who were employed on the train at the time plaintiff's intestate was killed, having been examined as witnesses for the company, they may be questioned, on cross-examination, as to their statements and declarations relative to the accident, made a day or two after it happened ; such questions are certainly permissible, as laying a predicate for proof of contradictory statements, even if they exceed the large latitude which is allowed in the cross-examination of witnesses.

APPEAL from the Circuit Court of Limestone.

Tried before the Hon. W. B. WOOD.

This action was brought by Samuel Tanner, as the executor of the last will and testament of Peterson Tanner, deceased, against the Louisville & Nashville Railroad Company, to recover damages for the alleged wrongful act and negligence of the defendant's agents and servants, by means whereof, in September, 1872, plaintiff's testator was run over and killed by an engine and train of cars ; and was commenced on the 29th August, 1873. The defendant pleaded, 1st, not guilty ; 2d, that the death of plaintiff's testator "was not produced by any negligence of this defendant, nor by any act, omission, or culpable negligence of any engineer, or other officer employed, or agent of defendant, nor by any act or omission of this defendant, or of any person for whose act or omission this defendant was or is liable, or whose act or omission was authorized by this defendant ;" and, 3d, "that the injury to and death of said Peterson Tanner, in said complaint complained of, would not have occurred without his fault or negligence, and that his fault and negligence, above in this plea referred to, contributed to produce the said injury to and death of said Peterson Tanner." The plaintiff demurred to the second and third pleas, assigning as ground of demurrer to the third, "that mere negligence on the part of plaintiff's testator would not relieve defendant of responsibility in this action." A memorandum of the clerk, and the bill of exceptions, each states that the demurrer was overruled, and that issue was then joined on all the pleas ; but the judgment-entry does not show any of the rulings of the court on the pleadings, only reciting that the cause was tried on issue joined.

The bill of exceptions purports to set out all the evidence adduced on the trial, including the depositions of six or eight witnesses, agents and servants of the railroad company, to whom numerous interrogatories were propounded by each party, numbering from fifteen or twenty to more than one hundred each; and more than forty exceptions were reserved by the plaintiff to the rulings of the court on questions of evidence. The opinion of this court renders it unnecessary to give a detailed statement of the evidence, or even of most of

the rulings to which exceptions were reserved. It appeared that the deceased, on the morning of the day on which he was killed, left his store in the town of Athens, on horseback, for the purpose of examining and marking some cross-ties, which he and his partner were delivering to the railroad company, at different points along the track, by contract between them and the company. He was riding on the track, about eight o'clock in the morning, near a crossing called the "Canada Crossing," when a train approached, consisting of an engine, tender, and one caboose car, coming from the direction of Athens; and he continued on the track, looking back at the train, and increasing the speed of his horse, until within fifty yards of the crossing, near or at the mouth of the cut in which he was, when his horse became unmanageable, and threw him, on or near the side of the track, in front of the engine, and he was run over and injured, and died two days thereafter. The only eye-witnesses of the accident were the persons on the train, servants of the railroad company, whose depositions were taken by the defendant.

Albert Hollopeter thus testified: "The freight train on which I was a brakeman, engine No. 316, was coming north from Decatur, about one and a half or two miles north of Athens, some day in September, 1862, (I forget the day,) between seven and eight o'clock A. M., when a man was thrown from his horse, and fell near the railroad track; and two or three of his fingers were cut off by our train. That was all the damage done him by the train. I did not know his name, but was told afterwards that his name was Peterson Tanner. I was on the engine, and saw him riding on the track, several hundred yards ahead of us. As soon as the engineer could have seen him, he did see him, and immediately blew the alarm whistle, and the fireman rang the bell. Mr. Tanner was on horseback, and heard us coming; and he would ride a little piece, look back at us, and then spur up his horse a little faster. He kept this up some little time. As soon as we saw him, the engineer shut off the steam, and called for brakes; and when we got within seventy-five, or one hundred yards, the engineer reversed his engine." "He was riding in the middle of the track, when we first saw him; and he continued there until we got pretty close on to him, when he was turning off the track. He was off, on the side of the road-bed, when he received the injury, outside of the rails. He was thrown from his horse, just before we got up to him. He was thrown on his back, with his arms stretched out, and was lying rather alongside the track. When first seen by us, he was several hundred yards ahead of us, on the track, moving at a moderate rate of speed, say five or six

miles per hour. He did not leave the track. He was several hundred yards off, when first observed by me. The line of the road is straight, and continued so until beyond the point of the accident." [The train was moving] " about twelve miles per hour; was running very slow when he was hurt, say two miles per hour; running slower and slower all the time, trying to stop the train; and the train was stopped about thirty or forty feet from the point at which the accident occurred." " He seemed to pay some attention to our train; he would turn around occasionally, and look at us. I was on the tank of the engine, looking at him. He made no attempt or effort to leave the track, until we were almost upon him. He then seemed to make an effort to get off the track, but his horse became frightened, and threw him. He could have got off [the track] easy enough, if it had not been for his horse becoming unmanageable. It was on level ground; no embankment or hill prevented him from getting off. He had ample notice and time to get off before his horse became frightened; and then there was nothing but the frightened condition of his horse which prevented his escape. After being thrown, he fell near the side of the track, and lay there until the cars came along. He was injured by the fall from his horse, and was lying there blowing blood out of his mouth. He made no attempt to get out of the way of the approaching train. I should say that he was insensible. I was looking at him as we approached where he lay, and had a clear view of him. The horse ran off into the woods, and was not struck or injured at all."

John L. Brown, the engineer of the train, testified : " In coming from Athens, Alabama, on the morning of September 2d, I think it was, 1862, my engine, No. 316, ran against a man. I did not know his name, but learned for the first time, when we brought him into Athens, that his name was Peterson Tanner. When about one and a half miles north of Athens, and running about twelve miles per hour, I saw a man on horseback, about one mile ahead of me, going north, straight up the track. I blew the cattle whistle, to make him get off the track; but he seemed to pay no attention to it. I continued to blow, until we had got within about one hundred yards of him, and still he did not get off. I then called for brakes, and reversed the engine, and tried every means to stop the train. When we got pretty close up to him, he seemed to try to turn off the track; but his horse became unmanageable, and threw him on the side of the track, just before we got to him. He seemed to be stunned, so that he could not get out of the way, and made no effort to do so." "When I first saw him, he was riding on the

track between the rails, and going at a slow rate of speed; and he did not leave the track after I saw him. He was about a mile from me, I suppose. The line was straight where I first saw him, and was the same where the accident occurred, and so was the intermediate space. We were running about twelve miles per hour when I first saw him, and were running very slowly—had almost stopped—when the accident happened. I first blew the alarm whistle, for a mile before I got to him, to make him get off the track. When within one hundred yards of him, the bell was rung for the same purpose; and then the brakes were applied, the engine reversed, and steam applied, to stop the train more readily." "I don't know what he was doing on the track, nor why he should have stayed there so long after he was warned off. There was nothing to prevent him from getting off. He could have gotten off easily, if it had not been for his unmanageable horse. It was upon a level piece of ground; no cut or embankment in his way."

Rufus Crenshaw, the conductor of the train, testified: "When about one and a half miles north of Athens, I discovered a man on horseback, riding in the middle of the track. The bell was immediately rung by the fireman, and the engineer commenced sounding the whistle, as for cattle alarm. The train was running at a speed of twelve miles per hour. The man was riding at a slow gait, and apparently made no attempt to get off the track, out of the way of the train. The whistle was sounded incessantly. When the train was within about seventy-five yards of the man, the whistle was sounded to put on brakes, and I saw them applied. After running within about twenty-five yards of the man, he then apparently made his first attempt to get off the track; but the horse, becoming frightened at the sound of the whistle, became unmanageable, and, rearing upon his hind feet, threw the man on the iron rail, inflicting a severe cut on the side of his head. The pilot of the engine struck him, before he could recover himself from the fall, and one hand was run over by the wheel. After striking the man, the train, which consisted of engine and caboose, ran about forty feet, and stopped. Myself, engineer, and crew, then picked up the man, placed him in the caboose, and returned to Athens. The horse Mr. Tanner was riding got out of the way, and was not injured by the train. The place where the accident occurred was on straight and level ground, and the location on either side of the track, at this point, is very favorable for getting out of the way of passing trains."

The depositions of these witnesses were taken by the defendant, but that of Crenshaw was read in evidence by the

plaintiff, the defendant declining to read it. Among the interrogatories propounded to them by the defendant, were the following: 15th. "State whether all the means in your power, known to skillful engineers, such as the application of brakes, and the reversal of the engine, in order to stop the train, were used and applied by you and the other servants and employees on said train, before Mr. Tanner was struck by the locomotive and cars of the said train." 22d. "State whether he could have gotten off, and avoided being struck, but for being prevented as stated by you. Describe the ground at the place where he was thrown from his horse, and struck by the engine. Was it upon a level, cut, or embankment, at which he was injured? Was the ground and the bearings of the road-bed such as would have allowed or permitted him to escape injury or hurt by the locomotive and cars, but for his own acts, conduct, and doings?" The plaintiff objected to the said 15th interrogatory, "because it is illegal, and seeks illegal evidence; because it is leading; because it suggests the answer desired; because it seeks a conclusion of facts, and not the facts themselves, and because it seeks a conclusion of law;" and he made the same objections to the latter part of the 21st interrogatory. The court overruled these objections, and the plaintiff excepted. Several cross-interrogatories were propounded to these witnesses on the part of the plaintiff, substantially like the following: "64. Did you not say to, or in the presence of W. B. Vaughan and W. Russell, at the depot in Athens, the day of the occurrence, or a day or two after it, that you were on the engine at the time Mr. Tanner was struck by the train, and that you, or 'we,' referring to those who had control and management of the running of the train, saw the man on the track some time before you (or 'we') got to him, but thought he was a boy trying to see how long he could remain on the track, and you (or 'we') thought you (or 'we') were going to have a nice race, and for that reason did not blow the whistle," &c. On objection by the defendant, the court suppressed this, and all similar interrogatories, with their answers; to which rulings exceptions were reserved by the plaintiff.

On the part of the plaintiff evidence was adduced, contradicting the testimony of these witnesses, as to the ringing of the bell and other signals and precautions used by them, and the nature of the ground at the place of the accident; but the opinion of this court does not require a statement of all the evidence on these controverted points, and a partial statement would not be correct. Mahala Mastin, a negro woman, who lived near the scene of the accident, and, hear-

ing the alarm signals, hastened to the road to see what was the matter, was examined as a witness for the plaintiff, and testified that, as the train passed her, returning to Athens after the accident, " she saw a man lying on the floor of the car, seemingly dead ; that he was picked up at the north end of the cut, and the train passed her a few minutes afterwards, some of the men standing in the door of the caboose. Plaintiff asked said witness, whether the train hands, or any of them, as they passed, said anything to her, and what ? To this question defendant objected, and the court sustained the objection; to which plaintiff excepted. Plaintiff then asked said witness, what was the conduct of the officers and servants on the train, when they passed her ? To this question, also, the defendant objected, and the court sustained the objection; to which the plaintiff excepted. Plaintiff then proposed to prove, by said witness, that the men on the train, as it passed her, were laughing and jesting at her, and threatening to jump out and hit her, and other levitous conduct; to which evidence defendant objected, and the objection was sustained ; and plaintiff excepted."

The court allowed several witnesses, agents of the railroad company, to testify on the part of the defendant, against the objections of the plaintiff, that they had warned and notified persons not to walk or travel on the railroad track, as it was forbidden by the company and by law; and some witnesses testified that they had been so notified, but no notice to the plaintiff's testator was proved. The plaintiff reserved exceptions to the admission of this evidence. One Harahan, a witness for the defendant, who was road-master, and testified as to the condition of the road and other matters, was asked by the defendant, "if there was any danger, and what, to the employees and train, in running over stock ;" and answered, " that there was the danger of the train being thrown from the track and wrecked." To this question and answer, each, the plaintiff objected, and excepted to their allowance.

Upon all the evidence adduced, the court charged the jury—

"1. A railroad company is the absolute owner of its track, and has the right to its free and unmolested use ; and between stations and public crossings, the track belongs exclusively to the railroad company, and all persons who walk or ride thereon, without the permission or authority of the company, are guilty of negligence, and they take the risk of the consequences upon themselves ; provided the company, in running their locomotive and cars, use ordinary care and diligence to prevent injury to persons who may casually be on the track. In towns, and at public crossings, they are re-

quired to give the usual signals, of ringing the bell, or blowing the whistle; but, in passing along the road in the country, not near a public crossing, no such signals are required, but only ordinary care and diligence, by keeping a proper lookout, to see whether there is anything on the track; and on perceiving anything on the track, the engineer should use all means in his power, known to skillful engineers, such as the application of brakes, and reversal of the engine, in order to stop the train, or, at least, to have it within his control, when there is sufficient time and space to do so.

"2.   Whenever there is such negligence, on the part of the person injured, as essentially contributes, directly, or as a proximate cause, to the occurrence from which the injury arises, amounting to the want of ordinary care on his part, such negligence will prevent the plaintiff from a recovery of damages, unless it is shown that the act which caused the injury was wanton and intentional.

"3.   If you find, from the evidence, that the person in charge of the locomotive and train was using ordinary care and diligence in running the engine, and that Tanner was injured because of his own negligence, then the defendant is not liable for damages.   But, if you find from the evidence that ordinary care and diligence were not used by the engineer, or other person running the engine, and that the injury to Tanner was caused wantonly and intentionally, then, although Tanner may have been guilty of negligence in going on the track, the plaintiff may recover damages.

"4.   The question for the jury to determine from the evidence is, whether Peterson Tanner, by being on the railroad track, at the time, in the place, in the manner, and under the circumstances as developed by the testimony, was guilty of such negligence as contributed to his death; whether the railroad, by its officers or agents, was using ordinary care and diligence in the running of its engine.   If so, the plaintiff cannot recover.   Or, whether his death was caused by the want of due and proper care of the parties in charge of the locomotive or train, without such negligence on the part of Tanner as essentially contributed to his death; and in the latter case, he is entitled to recover.

"5.   The jury must look at the testimony—to all the circumstances connected with the injury—the time, the place, the situation of the parties, the rights and duties of the parties, the relative degrees of care used by each, or the want of it, and all the surroundings, and the conduct of the parties—to determine the question of negligence in one or both of the parties; and if, under the principles of law which I have given you in charge, you find for the plaintiff, you

will assess his damages at what the proof shows he is entitled to have, not exceeding three years' income of the deceased, and not more than three thousand dollars; but, if you find for the defendant, you will say, ' We, the jury, find for the defendant.' "

The court charged the jury, also, at the request of the plaintiff in writing, as follows:

" 1. Where a railroad company, by itself or agents, is a wrong-doer, it is responsible for all the consequences which flow immediately from its wrongful or negligent act; and the responsibility is not relieved by the fact, that the consequences of the injurious act could have been prevented by the care or skill of the injured party.

" 2. If the defendant permitted the public, in the neighborhood in which Mr. Tanner lived, and when and where he was killed, to ride and walk on its track, and people were in the habit of doing so, and Mr. Tanner had no notice not to do so; then this is a circumstance to be considered by the jury, in determining whether Mr. Tanner was negligent in going upon the track at such a place.

" 3. The character of Mr. Tanner, for prudence and caution, is a circumstance to be looked to, to determine whether he was negligent at the time of the injury.

" 4. If the agents of the defendant could have prevented the injury, by the use of ordinary care and prudence, it was their duty to do it, even if the injured party acted with carelessness and incaution."

The court refused the following charges, which were asked by the plaintiff in writing:

" 1. If the agents of the defendant did not, on perceiving Mr. Tanner, apply the brakes, and reverse the engine, and use all means in their power, known to skillful engineers, to stop the train; and they saw, or could have seen Mr. Tanner, in sufficient time to have stopped the train before it got to him; then, if Mr. Tanner was injured by the train directly, or by his horse, which was run up to and frightened by the train, then the defendant is liable.

" 2. The injured party is not chargeable with negligence, in riding a short distance along on a railroad track, at a point over which the people generally had been in the habit of walking and riding for many years before; and there is no evidence of dissent on the part of the railroad company, except a notice thereof to two or three men in the neighborhood, given several years before, and not communicated to the injured party; and there is no schedule train due for several hours; and the injured party made every effort he

could to get off, as soon as he saw or heard a special train approaching.

"3. The agents of the defendant, on perceiving an obstruction on the track, ahead of a train which they are running, must put on the brakes, and reverse the engine, and use all other means in their power to stop, if such were practicable and available; and if they fail to do these things, and injury result, the defendant is liable."

The court charged the jury, also, at the request of the defendant in writing:

1. "The plaintiff can not recover, under his complaint in this case, unless you believe, from the whole evidence, that the death of Peterson Tanner was caused by some wrongful act, or omission, or culpable negligence, of an officer or agent of the defendant, which is alleged in the complaint; and if said Peterson Tanner was guilty of fault or negligence, contributing to the injury, and that without such fault or negligence on his part he would not have been injured, the jury ought to find a verdict for the defendant.

2. "If the plaintiff's testator, Peterson Tanner, was on horseback, riding on the railroad track of the defendant, between a station and public crossing, he was subject to all the risk incident to such an undertaking, and was bound to use his eyes and ears, as far as there was opportunity to discover and avoid danger; and if, by such use of his senses, he might have discovered and avoided danger, but omitted to do so, and if such omission on his part contributed to produce the injury complained of in this case; and if, without such omission on his part, the injury would not have occurred, then, upon this state of facts, the plaintiff is not entitled to a verdict.

3. "If said Peterson Tanner was riding on a horse, on the railroad track of the defendant, between a station and a public crossing, and was apprised of the approach of the train, by the noise, in time, and with opportunity to have avoided injury to him, by dismounting from his horse, or otherwise; and if, after being so apprised of the approach of the train, he ventured to remain on his horse, and on the track, from a miscalculation of his danger, the error was his, and the defendant is not answerable for that erroneous calculation.

4. "If the evidence as to the question, 'What caused the death of said Peterson Tanner,' is so precisely balanced that it is impossible for the jury to believe and say on which side of that question the weight and preponderance of the evidence is; then, under this state of the evidence, the jury ought to find a verdict for the defendant,

[Tanner's Executor v. Louisville & Nashville Railroad Co.]

5. "If, after weighing all the evidence, and after ascertaining what mistakes, if any, have been made by any and every witness, and throwing aside all testimony founded in mistake, the jury believe, from the evidence which they believe free from mistake, that any one of the three pleas filed by the defendant is true in substance, they ought to find a verdict for the defendant.

6. "A railroad company has a right to the free and uninterrupted use and enjoyment of its railroad; and a man who willfully and negligently interferes with its right, and thereby brings injury upon himself, must suffer the consequences of his own neglect or folly.

7. "A man who essentially contributes, by his own misconduct or negligence, amounting to want of ordinary care, to produce any injury, can not recover of a wrong-doer, whose act was not wanton and intentional."

The plaintiff excepted to each of the charges given by the court, and to the refusal of each of the charges asked by him.

The rulings of the court on the pleadings and evidence, and the several charges given and refused, to which exceptions were reserved, are now assigned as error, making in all sixty assignments of error.

McClellan & McClellan, for appellant.—1. The third plea is certainly bad, and the demurrer to it ought to have been sustained. The facts set up in it would constitute no defense at common law, and much less under the statutes of Alabama. At common law, the fault and negligence of the plaintiff, to bar a recovery by him, must have been the direct and immediate cause of the injury: and even then, if the defendant could have prevented the accident by the use of ordinary care and diligence, the plaintiff could recover.— *Pharis & Herndon v. Stewart*, 9 Porter, 336; *Steamboat Farmer v. McCraw*, 26 Ala. 189; *Grant v. Moseley*, 29 Ala. 302; 45 Mo. 255, 322; 48 Illinois, 221; 49 Illinois, 490; 38 Illinois, 370; 43 Miss. 233; 24 Geo. 75; 27 Geo. 113; 2 Amer. 517. Besides, the plea entirely ignores the statutes of Alabama, and dispenses with a compliance on the part of the defendant with any of their provisions.—Rev. Code, §§ 1399-1401.

2. The testimony of Mahala Mastin, as offered, was competent evidence against the defendant. In the first place, this evidence was the conduct and declarations of the defendant's agents and servants, in the performance and prosecution of its business; and it was admissible against the defendant on that ground.—1 Greenl. Ev. §§ 113-15; 48 Ala. 15. They were bound by the obligations of law and hu-

manity to carry the wounded man where he could receive proper medical care and attention ; and if they had failed to discharge this duty, and death had ensued for the want of such care and attention, the liability of their principal cannot be denied.—29 Maryland, 420.    In the next place, the evidence was admissible, as a part of the *res gestœ :* it sprung out of the main fact—that is, the killing—was inseparably connected with it, and served to elucidate and explain it.— *Gandy v. Humphries,* 35 Ala. 617.    The rule of evidence, in such cases, necessarily includes all the attendant circumstances and surroundings of the main fact; and the cry and clamor of the mob in pursuit, and their acts and utterances in returning, are equally within the rule.    Besides, the unseemly and inhuman conduct of these men, on such an occasion, would go far to establish their unfitness for the positions in which they were placed by the defendant, and to justify the inference by the jury that the injury was willfully and wantonly inflicted by them.

3.  The court erred, also, in allowing leading questions to be put to the witnesses, and in allowing them to state their opinions and conclusions, as shown by the several specific exceptions which were reserved.    Whether the deceased could have escaped ; whether he had ample time to get off the track, if he desired to do so ; whether there was nothing to prevent him from leaving the road ; whether the defendant's servants, in charge of the train, used all possible means to prevent the injury : these, and other similar questions and statements, were not competent evidence.

4.  Notice to other persons to keep off the railroad track, did not tend to prove notice to the deceased, and was not relevant to any of the issues in the case ; and yet the tendency of such proof was to mislead the jury, by inducing them to suppose they might draw that inference.    Nor was the evidence of Harahan, as to the danger to the employees on the train, at all relevant to any of the issues.    A wrongdoer can not set up the evil consequences of his wrongful act to himself, as a defense to an action for the injury thereby caused to other persons ; but this is the principle on which the admission of the evidence rests.    If this principle be correct, it will be to the interest of all railroad companies to employ careless and reckless men in their service, who are equally indifferent to their own danger and that of other persons, whose safety may be intrusted to their care.

5.    The cross-interrogatories propounded to the defendant's witnesses, and the answers thereto, were improperly suppressed.    The evidence sought to be elicited was relevant and competent, for the reasons stated in the second para-

graph *supra*.  The questions did not exceed the legitimate limits of a cross-examination, and were certainly competent for the purpose of laying a predicate to impeach the witnesses.—1 Greenl. Ev. § 462.

6.  The charges given, and the refusal of the charges asked, required only ordinary care and diligence from the servants of the railroad company, and even dispensed with that if the deceased was at fault.  The authorities above cited, in the first paragraph, lay down the rule as to the doctrine of contributory negligence, and clearly demonstrate the error in the charges of the court.  The decisions of this court, there cited, are founded on common-law principles, and based on justice and sound reason.  The statutes of Alabama, which are to be construed *in pari materia*, as forming one general system, require a much higher degree of care, and impose greater responsibilities.  An action is given against a railroad company, for causing the death of a human being, whenever such death arises from any wrongful act, omission, or culpable negligence, on the part of any of its officers or agents ; and the wrongful act, omission, &c., is defined to be, among other things, a failure on the part of such officers or agents, on perceiving any obstruction on the track, to use all means in their power, known to skillful engineers, to stop the train, or any other misconduct on their part.—Rev. Code, §§ 1399, 1401, 2297, 2300.  There are no conditions or qualifications annexed to these requirements.  No judicial tribunal can disregard them, or explain them away, or engraft any exceptions on them.  Until these requirements have been strictly complied with, no question of contributory negligence can arise.—*M. & O. R. R. Co. v. Malone*, 46 Ala. 391 ; *N. & D. Railroad Co. v. Coman*, 45 Ala. 437; 5 Amer. 214; 1 Redf. 544; 1 U. S. Digest, N. S. 620, §§ 53–4; 4 Cush. 402 ; 4 How. 468; 9 Metc. 1 ; 1 Amer. R. R. Cases, 591.

7.  Another grave error in the charges of the court is in absolving the defendant from responsibility, "unless the injury was *wanton and intentional;*" in other words, that the railroad company is not responsible for the consequences of the misconduct of their agents in the transaction of their business, unless the agents were guilty of murder in the first degree.  In such a case as that, it is doubtful if a recovery could be had against the railroad company ; since, but for the statute, the civil injury would be merged in the felony.  *Grant v. Moseley*, 29 Ala. 302.  In all actions for damages on account of negligent or tortious acts, the question of intent is immaterial, except as affecting the *quantum* of damages.  *Hussey v. Peebles*, 53 Ala. 432 ; 1 Chitty's Pl. 129 ; 2 East, 104.

RICE, JONES & WILEY, *contra.*—1. If the plaintiff's testator, by his negligence, contributed to the injury complained of, there can be no recovery against the railroad company. "For a person, engaged in his ordinary affairs, or in the protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury, is negligence, which will preclude a recovery."—*Eckert v. Long Island Railroad Company*, 3 Amer. 723. To the same effect is the case of *Bellefontaine Railway Company v. Hunter*, 5 Amer. 205–215. These cases, and the authorities cited in them, are decisive of the principles of law involved in this case, when applied to the pleadings and evidence; and they show that the court committed no error in the instructions to the jury.

2. The declarations of the defendant's agents and servants, as proposed to be proved by Mahala Mastin, were merely narrative of a past occurrence, and not admissible as part of the *res gestæ.*—*Ashcraft v. M. & M. Railroad Co.*, 48 Ala. 9; *Thompson v. Mawhinney*, 17 Ala. 362.

3. All the other exceptions as to questions of evidence, when scrutinized, will be found to fall under the principles settled in some one or more of the following cases: *De-Graffenreid v. Thomas*, 17 Ala. 602; *Wall v. Williamson*, 11 Ala. ——; *McCargo v. Crutcher*, 27 Ala. 171; *Tyson v. Walker*, 52 Ala.; *McCreary v. Turk*, 29 Ala. 244; *Ocean Ins. Co. v. Francis*, 2 Wendell, 65; *Hiscox v. Hendree*, 27 Ala. 217.

STONE, J.—Speaking of the steam-engine, called by Mr. Justice Caruthers, of the Supreme Court of Tennessee, the "most grand and useful improvement of the age," and of its use as an instrumentality in travel and commerce, we, in *Grey's Executor v. Mobile Trade Company*, 55 Ala. 387, said, that a common carrier, who employs steam as his motive power, must bring to the service "that degree of diligence which very careful and prudent men take of their own affairs." We added, that "in this we but affirm that only very careful and prudent men should be placed in charge of such vehicles of transportation, and that they shall employ their care and prudence actively, as such men watch over their own important interests and enterprises, of similar magnitude and delicacy." In the language quoted, we were speaking of the care and diligence required in the transportation of merchandise. For a much stronger reason, should the rule be observed in carrying passengers, because human life is by far the most cherished and valuable of earthly endowments and possessions.

Of railroads, Mr. Justice Caruthers said: "The policy of

our decisions has been, so far as consistent with the safety of life and property, to encourage and protect this most grand and useful improvement of the age. But the consequences of carelessness and want of due skill in their management is so frightful and appalling, that the most strict and rigid rules of accountability must be applied, where there is any dereliction of duty. Every reasonable precaution must be used, to avoid accidents and injury to others, at the peril of strict and ample accountability. They enjoy almost a monopoly in the business of common carriers, wherever they exist, both as to persons and property. A necessity to patronize them is imposed upon all, by the circumstances of the times; all other modes of travel and transportation having been superseded by this, on account of its greater ease and astonishing speed. While, on the one hand, the courts should protect them with a strong hand against unjust demands, and injuries to their property, which popular prejudice may favor or inflict; on the other, the security of life and property requires, that they should be held to a strict and skillful performance of all the duties imposed on them by law. All will agree, however, that in the management of locomotives and trains, so powerful for mischief as well as for good, the rules of liability for the destruction of life or property should be such as to impose the duty of very great care and diligence on the part of those who control them."

But this, like all other human duties, has its correlative rights and immunities. Infallibility is not exacted of those in charge of this fearful engine of good and of evil. They are required to be prudent, and skilled in their particular departments. But they deal with those of their fellow-beings who have attained to years of discretion, as intelligent beings, having the sense of danger, and instinct of self-preservation, common to humanity. They are authorized to predicate of such, that, seeing a train approaching in dangerous proximity, they will, if of discreet age, promptly get off the track, and place themselves out of harm's way. They have a right to assume this, for such is the conduct, such the instinct, of the commonest intelligence. For a traveller, whether mounted or on foot, to step from the track of a railroad, is, ordinarily, the work of a moment; while, to stop or check up a train in motion, involves delay, and, on fast lines, a disarrangement of schedule punctuality, which not only might disturb and delay other trains, but might also lead to collisions, with all their fearful consequences. Railroad tracks are not public highways for general travel. They are not constructed for that. They are private property, built and

adapted exclusively for their own rolling stock; and no one can claim the right to be or remain upon them, as a mere legal right. Like one's domicile, which, in common-law phrase, is called his castle—or, even, like one's freehold, no stranger has the right to be upon it, except by permission of the owner, express or implied.

In a note to section 133, 1 Redf. on Railways, is the following forcible language: "The practice of allowing persons to walk upon a railway track is a vicious one, and one which would not be tolerated in any State or country, where the railways are under proper surveillance and police. But, as it now is in many parts of this country, an engineer will find some person upon his track every mile, and, in some places, every few rods. If he were required to check the train at every such occurrence, it would become an intolerable grievance. If men will insist upon any thing so absurd, as to be permitted to walk upon a railway track at will, they must expect that those who are bereft of sense, but preserve the form of humanity, when they chance to come into the same peril, will perish; not so much from their own infirmities, as from the absurd practice of those who have no such infirmities. And their destruction is not so much attributable, perhaps, to the fault of the railways, as to the bad taste and lawlessness of public opinion, in making such absurd demands upon the indulgence of railways. And, if it be urged that the companies might enforce their rights, and keep people off their tracks; it would be found, we fear, upon trial, that such arguments are unsound. The companies, probably, could not enforce such a regulation, in many parts of the country, without exciting a perplexing and painful prejudice, to such an extent as to endanger the safety of their business. The only effectual remedy will be found in making the act punishable by fine and imprisonment, as is done in England and some of the American States, and in a strict enforcement of the law upon all offenders."

But, the right of a freeholder or householder, to eject from his premises any one found there against his consent, is hedged about with many restraints, imposed for the safety and welfare of the intruder, although, in the eyes of the law, such intruder may be, technically at least, a wrongdoer. He must be first warned to depart. If this fail, then hands may be laid gently upon him to put him out; and, in the extremest case of obstinacy, only so much force may be used, as appears reasonably necessary to accomplish the object. The law so respects human life, and those feelings of self-respect which lie at the foundation of our manhood, that it does not pronounce sentence of outlawry against even

the willfull or obstinate wrongdoer. It furnishes no measurement, by which to determine the relative value of human lives. "Thou shalt not kill," has been a prominent canon in all civilized governments.—Shearman & Redfield on Negligence, § 24.

The doctrine of contributory negligence was declared, long before steam was utilized as a mechanical force. It was first adapted to collisions of vessels, and of vehicles on the public highways. It was ruled that, in the adjustment of losses in admiralty proceedings, comparative negligence would be taken into the reckoning, and the burden of the loss adjusted accordingly. But, in suits at common law by one party, to recover damages caused by the collision, the declared rule was, that if the plaintiff, by his negligence, contributed proximately to the injury, he could not recover, although the fault of the defendant may have greatly exceeded his own. The law court would not enter upon the inquiry. This principle did not rest on the idea, that one wrong set off the other, or that one justified the other. It was founded on the broader ground, that when the negligence of the plaintiff has contributed proximately to the injury, the damage is considered of his own producing, and it is difficult, if not impossible, to determine the *quantum* of injury which resulted from the defendant's tortious or negligent conduct. The theory was, that in such case, if the plaintiff had himself done no wrong, no injury would have resulted. Therefore, to allow such plaintiff to recover in such case, would be to allow a recovery for the proximate consequences of the plaintiff's own negligence. The rule was, however, that to constitute a good defense in bar, the plaintiff's contributory negligence must be proximate, not remote. Wharton on Neg. §§ 300, 301; Shearman & Redf. on Neg. § 24; *Railway Co. v. Whitton*, 13 Wall. 270; *Same v. Gladmon*, 15 Wall. 401; *Johnson v. Hudson Riv. R. R. Co.*, 20 N. Y. 65; *Ernst v. Same*, 35 N. Y. 9; *Renwick v. N. Y. Central R. R. Co.*, 36 N. Y. 132; *Parker v. Adams*, 12 Metc. 415; *Shaw v. Boston & Worcester R. R. Corp.*, 8 Gray, 45; *Wynn v. Allard*, 5 Watts & Serg. 524; *Railroad Co. v. Aspell*, 23 Pa. St. 147; *Reeves v. Del. L. & Western R. R. Co.*, 30 Penn. St. 454; *Toledo & Wab. R. R. Co. v. Goddard*, 25 Indiana, 185; *Ill. Central R. R. Co. v. Phelps*, 29 Ill. 447; *Same v. Weldon*, 52 Ill. 290.

A qualification of the doctrine has been affirmed, to the effect that, notwithstanding each party may have contributed proximately to the result, yet, if the defendant wantonly, recklessly, or intentionally brought about the result, mere

negligence in the plaintiff, contributing proximately to it, will not bar his right of recovery.

Legal principles, framed for one state of society, for one state of mechanical development, are not necessarily adapted to a more advanced development. Progress in industrial arts requires a modification of judicial rules. The steam-engine has revolutionized labor and commerce, and has made it necessary to ordain a new legal system for its protection and government.

In most cases of railroad accidents, the conduct, from which negligence is sought to be inferred, presents itself in at least two stages ; first, in placing parties in a situation of peril ; second, in employing or not the proper means to avert the impending danger. Diligence is required of both par-ties—the railroad employees, and the person endangered—through all the stages ; and the negligence of one party does not excuse the other from the employment of proper dili-gence, until the danger be passed. If those in charge of a train, even in the rightful exercise of their skill and diligence, find a person dangerously exposed, although such exposure was brought about by the negligence of such person, the duty of diligence resting on the officers of the train is not in the least diminished on that account. In such case, although they will stand acquitted of all blame in this first stage of the peril, yet, when the peril has become reasonably mani-fest, so as to create the presumption that it was compre-hended, each party must again be diligent to prevent the catastrophe. If the person endangered be negligent at this crisis, and suffer injury, which proper care and diligence could have averted, the law affords him no redress. On the other hand, if employing proper care and diligence to escape the danger, to which his own previous negligence had con-tributed proximately to expose him, those in control of the train fail to apply proper skill and diligence to avoid the injury, when such skill and diligence, if promptly resorted to, might have prevented it, this is wanton or reckless negli-gence, for which the railroad will be held accountable. In such case, the negligence of the person injured, which first placed him in jeopardy, becomes remotely contributory to the actual injury sustained, and is no bar to the suit. This rule, however, does not apply where the manifestation of the peril and the catastrophe are so close in point of time, as to leave no room for preventive effort.

As we understand the rule of contributory negligence, it has been modified substantially, as we have indicated above. Wharton, Law of Negligence, § 300, says : "If the defendant is guilty of gross negligence, he can not set up a trifling neg-

ligence or inadvertence of the plaintiff as a defense." Shear-
man & Redf. on Neg. § 25, after stating the general rule, that
a plaintiff can not recover, if he has been guilty of proximate
contributory negligence, "so that, but for his concurring
and co-operating fault, the injury would not have happened
to him," excepts from the operation of the rule cases "where
the direct cause of the injury is the omission of the other
party, after becoming aware of the injured party's negligence,
to use a proper degree of care to avoid the consequences of
such negligence." In 2 Redf. on Railways, § 177, it is said:
"If the defendant is guilty of a degree of negligence, from
which the plaintiff, with the exercise of ordinary care, can
not escape, he may recover, although there was want of pru-
dence on his part; and in many cases, the plaintiff has been
allowed to recover for the gross negligence of the defendant,
notwithstanding he was, at the time, a trespasser upon the
defendant's rights."

In the case of *Tuff v. Warman*, 5 C. B. Rep. N. S. 573,
the English Court of Exchequer said: "Mere negligence, or
want of ordinary care or caution, would not disentitle a
plaintiff to recover, unless it were such that, but for that neg-
ligence, or want of ordinary care and caution, the misfortune
could not have happened; nor, if the defendant might, by
the exercise of care on his part, have avoided the conse-
quences of carelessness or neglect on the part of plaintiff."

In *Greenland v. Chaplin*, 5 Exch. Rep. 243, Ch. B. Pollock
said: "I entirely concur with the rest of the court, that a
person who is guilty of negligence, and thereby produces
injury to another, has no right to say, 'Part of that mischief
would not have arisen, if you yourself had not been guilty
of negligence.' I think that, where the negligence of the
party injured did not in any degree contribute to the imme-
diate cause of the accident, such negligence ought not to be
set up as an answer to the action." See, also, case of *Tuff
v. Warman*, 5 C. B. Rep. N. S. 573.

In the case of *Button v. Hudson River R. R. Co.*, 18 N. Y.
248, the court said: "The deceased was found lying on the
track. This fact was as much the proximate and immediate
cause of his death, as the fact that the defendant's cars
passed over his body. The death was the combined result
of both causes. The jury should have been instructed that,
this being the case, the only question for them to decide was,
whether, by the exercise of reasonable care and prudence,
after the deceased was discovered, the driver might have
saved his life." See, also, *Oldfield v. N. Y. & Harlem R. R.
Co.*, 14 N. Y. 310.

In *Spofford v. Harlow*, 3 Allen, 176, the court said: "A

[Tanner's Executor v. Louisville & Nashville Railroad Co.]

party may be acting in violation of some particular statute, and still be under the general protection of the law. A third person has no right, merely because he is thus in fault, to run into him and injure him carelessly and recklessly." See, also, *Linfield v. O. C. R. R. Co.*, 10 Cush. 562.

In *Macon & W. R. R. Co. v. Davis*, 18 Geo. 686, the court said: "But it is insisted, that if the injury in this case resulted, in whole or in part, from the misconduct of the plaintiff's servant, that he can not recover; and this seems to have been the rule laid down in *Butterfield v. Forrester*, 11 East, 60, and *Luxford v. Large*, 5 Car. & P. 421. But this doctrine has been modified in later cases; and in *Lynch v. Nerden*, 1 Adol. & El. N. S. 29, it was held, that the defendant was liable in an action on the case, though plaintiff was a trespasser, and contributed to the mischief by his own act. . . . We approve of this modification of the principle, and think that it ought to be left to the jury to say, whether, notwithstanding the imprudence of the plaintiff's servant, the defendant could not, in the exercise of reasonable diligence, have prevented the collision." To the same effect is *Augusta & Sav. R. R. Co. v. McElmurry*, 24 Geo. 75.

In *Kerwhacker v. C. C. & C. R. R. Co.*, 3 Ohio St. 172, the court said: "The doctrine that where both parties are in fault, the party sustaining the injury can not recover, is subject to several very material qualifications."

In *Brown v. Han. & St. Jo. R. R. Co.*, 50 Mo. 461, the court said: "The fact that one person is in the wrong, does not, in itself, discharge another from the observance of due and proper care toward him, or the duty of so exercising his own rights as not to injure him unnecessarily. The cases are numerous, where parties have been held responsible for their negligence, although the party injured was, at the time of the occurrence, culpable, and, in some cases, in the actual commission of a trespass."—See, also, *Kennayde v. Pac. R. R. Co.*, 45 Mo. 245.

In the case of *Raiford v. Miss. Cen. R. R. Co.*, 43 Miss. 233, the court said: "The fact that the animals were on the road, did not justify the agents and servants of the company in regarding them there unlawfully, and in violation of the rights of the company, and in any measure release the company's servants from the observance of proper care and precaution for their safety."—See, also, *Corwin v. N. Y. & E. R. R. Co.*, 3 Ker. 42; *Wright v. Brown*, 4 Ind. 95; *Davies v. Mann*, 10 Exchequer, 546; *Bridge v. Gr. Junction Railway Co.*, 3 Mees. & Wels. 244; *Eckert v. L. I. R. R. Co.*, 43 N. Y. 502; *St. Louis, A. & T. H. R. R. Co. v. Manly*, 58 Ill. 300.

In the case of *Owners of Steamboat Farmer v. McCraw*, Vol. LX.

26 Ala. 189, this court said : "Because a flat-boat runs at night, when she should not, or ties up in the wrong place, would not justify a steamboat in running into her, any more than a stage-coach would be justified in willfully or carelessly running over a man lying asleep in the road ; and in all such cases, if the act causing the injury could have been prevented by the use of ordinary care, the failure to use it will render the party liable."—See, also, *Foster v. Holley*, 38 Ala. 76.

In the case of *Gov. St. R. R. v. Hanlon*, 53 Ala. 70, the defense relied on was contributory negligence. It was decided, that an infant, before reaching years of discretion, could commit no negligence ; that the negligence of the adult, having the care of him, was not his negligence ; and that, therefore, the defense of contributory negligence could not prevail against such infant. The court had said : "The general principle, that although a defendant has been guilty of culpable fault or negligence, producing an injury, yet, if his act was not wanton *and* intentional, and if the plaintiff, by his own misconduct or negligence, amounting to a want of ordinary care, essentially contributed to produce the result, he can not recover, is not controverted." This question was not necessarily before the court, and was stated as a conceded proposition. The word *and*, between the words *wanton* and *intentional*, should be *or*. Either wanton, reckless, or intentional injury done, overcomes the defense of contributory negligence. It is not necessary they shall all concur. To so hold, would be to decide that railroads and other corporations could probably never be held accountable for injuries caused by the misconduct or incapacity of their employees, if the person aggrieved had, by his own negligence or fault, contributed proximately to the result. It is doubtful if the doctrine of *respondeat superior* applies, where the servant or agent intentionally or willfully does the act complained of.—See 1 Redf. on Railways, 511, *et seq.* We, however, leave this question open.

We hold, then, that the defense of contributory negligence is not made good, if the plaintiff, after contributing by his own negligence to place himself in peril, employs proper diligence to extricate himself, and the defendant neglects to use diligence, which might have prevented the catastrophe. We hold further, that in this, as in all other services required of those having the control of railroad trains, the law exacts "that degree of diligence which very careful and prudent men take of their own affairs."—See *Ala. & Fla. R. R. Co. v. Waller*, 48 Ala. 459, 463. The demurrer to the third plea should have been sustained.

If the witnesses who alone saw the disaster, which re-

sulted in the death of Mr. Tanner, be believed, he, the deceased, was on the track of the railroad, where he had no legal right to be ; had timely warning and knowledge of the approaching train, and could have got off the track, much sooner than he seems to have attempted to do so. But for the fright of his horse, resulting in throwing him off, he would have escaped the danger. His horse did escape, which proves, at least, that he was dismounted when the train struck him. Unlike animals, often found on railroad tracks, Mr. Tanner was an intelligent human being, knew the speed and momentum of railroad trains, and should have got off the track. Doubtless he intended to do so. He possibly miscalculated his ability to reach the crossing, just ahead of him. The persons in charge of the train, perceiving by his movements that Mr. Tanner knew of their approach, were justified in supposing he would leave the track before they would come up with him. The testimony, in which there is no material conflict on this question, shows there were points at which he could have done so with safety. The law does not require that trains shall be stopped, or checked up, when persons of discreet years are seen on the track, unless, from their position or movements, or other cause, it can be inferred that they are not apprised of the approaching danger, or, from some other cause, they are unable to leave the track. Such requirements of railroads would greatly impede their business, and would do them a great wrong. When Mr. Tanner was thrown from his horse, upon the track, it became manifest that he was in peril, from which he could not probably extricate himself. It then became the duty of those in charge of the train, to use every means within their power to stop the train ; and if they failed to do so, and the jury should be satisfied that such exertions, promptly employed, would probably have arrested the train, and saved Mr. Tanner, then the charge of negligence is fastened on the railroad, and it must make reparation.—*Phila. & Reading R. R. Co. v. Hummell*, 44 Penn. St. 375.

What we have said above is based on the theory, that Mr. Tanner knew of the approach of the train, and that the surface of the contiguous ground was such, that there were points at which he could have left the track. Of course, if he were in a deep cut, or on a high embankment, which rendered it doubtful if he could pass beyond them before the train would overtake him, the train officers, being supposed to know the topography, should at once have taken measures to avert the danger.

On two questions, the charges and refusals to charge in

[Tanner's Executor v. Louisville & Nashville Railroad Co.]

the Circuit Court were in conflict with the rules we have de-
clared above.   One is, that the Circuit Court fixed the de-
gree of diligence required of railroad officers at too low a
degree.   Ordinary diligence does not meet the reasonable
requirements of such travel and transportation.   The other
error is based on that clause which, in the case of *Gov. St.
Railroad v. Hanlon, supra,* conjoins the words " *wanton* " and
" *intentional.*"   Either wantonness, or intention, on the part
of defendant, will overcome the defense of contributory
negligence.   We consider it unnecessary to apply these
principles to the various rulings of the Circuit Court, as what
we have said above will furnish a sufficient guide on another
trial.   We have attempted to declare certain exceptions,
which the later adjudications have engrafted on the doctrine
of contributory negligence.

What the railroad employees said, while returning to Athens
with Mr. Tanner, or after they reached Athens, were no part
of the *res gestœ,* and were properly excluded.—*Rigby v.
Williams,* 80 Penn. St. R. 107 ; *B. Railway Co. v. Hunter,*
33 Ind. 335.

The Circuit Court erred, in allowing defendant to prove
that there was danger to employees on the train in running
over stock.—*Montg. & West Point R. R. Co. v. Edmunds,*
41 Ala. 667.   The court also erred, in allowing proof to be made
that defendant's agents had notified persons, other than
plaintiff's intestate, not to travel on the railroad track.

The witness Brown should not have been asked, or al-
lowed to tell, that he used "all the means he had to stop the
train."   He could state what means he did use.   The latter
part of interrogatory 21, objected to, should have been ex-
cluded.   It called for conclusions, or inferences, of the wit-
ness.   Interrogatory 15 is objectionable in form, and should
have been excluded.   The witness should have been inter-
rogated as to what means he did employ.

As to the questions asked defendant's witnesses on cross-
examination, with a view to their impeachment, we think the
ruling of the Circuit Court can not be maintained.   Large
latitude should be allowed in cross-examination ; and we will
not say the questions should not have been allowed, aside
from all purpose of impeachment by other witnesses.   As a
predicate for proof of prior contradictory statements made
to others, they were unquestionably admissible, when time,
place, and circumstance were given.

Judgment of the Circuit Court reversed, and cause re-
manded.