# Loeb & Brother *v.* Flash Brothers.

*Trover by Vendor of Goods, against Sub-Purchaser.*

1. *Measure of damages.*—As to the measure of damages in trover, the court adheres to the rule laid down in *Jenkins v. McConico*, 26 Ala. 213 : that is, if the thing converted has a fixed value, the measure of damages is that value at the time of the conversion, with interest thereon at the discretion of the jury; and if the value is fluctuating, they *may* take its highest value at any time between the conversion and the trial; but it is error to restrict their discretion, by instructing them that they *must* allow the highest value.

2. *Fraud by purchaser, in buying goods.*— When a person who is insolvent, or in failing circumstances, obtains goods on credit from a merchant, with no intention or reasonable expectation of paying for them, and without disclosing to the merchant his condition, or furnishing him the means of information; this is a fraud, which justifies the merchant in disaffirming the contract; and he may recover the goods, unless an innocent third person has acquired intervening rights.

3. *Same; when contract is complete.* -A retail merchant in Montgomery, Alabama, applied to a wholesale merchant in New Orleans, for a bill of goods on thirty days' credit, and was required to furnish a reference as to his commercial standing; and the reference being unsatisfactory, the credit was refused by letter, unless a good acceptance was given; but a part of the goods had already been shipped by mistake, and the merchant in Montgomery acknowledged their receipt by letter, with instructions to draw on him for the money at thirty days; and the New Orleans merchant drew accordingly, and forwarded the draft by letter. *Held*, that the contract of sale was consummated by the writing and forwarding of this letter, and that the vendor could not, on these facts standing alone, disaffirm the contract, and reclaim the goods; but, if the purchaser was at the time insolvent, and did not intend to pay for the goods, or had no reasonable expectation of doing so, this would constitute a fraud, for which the vendor might disaffirm the contract.

4. *Same; proof of fraud.*—*Held*, also, that the transfer of the goods by the purchaser, without taking them into his possession, by agreement made before or at their arrival in Montgomery, to another merchant, to whom he was indebted, at less than cost price, was not in the regular course of business, and tended to show that, when he bought them, he did not intend or expect to pay for them.

5. *Same; liability of sub-purchaser, in trover.*—*Held*, also, that the vendor might, on these facts, maintain trover against such sub-purchaser; and that the latter, having only given credit for the agreed price on his existing debt, could not claim to be a *bona fide* purchaser for valuable consideration.

6. *Proof of fraud; evidence as to other transactions.*—On the question of fraud *vel non* in the sale of goods, a conspiracy, or common purpose, between the purchaser and sub-purchaser, being shown in a contest with the original vendor, suing for the conversion of the goods, and the transaction involved being attended with unusual features, it is permissible to inquire into other transactions between the parties at or about the same time.

[Loeb & Bro. v. Flash Brothers.]

7.   *Ratification of sale, by vendor.*—A ratification of the sale of goods, on the part of the vendor, under the facts above stated, will not be inferred, from the fact that, on receiving the purchaser's accepted draft, he indorsed and transferred it to a bank, unless such transfer was made with full knowledge of the fraud which had been perpetrated on him.

8.   *To what witness may testify*—A sheriff, testifying as to the levy of an execution, can not be asked, "if he had exhausted every effort to make the money on said execution."

9.   *Objection to question alone.*—Allowing an improper question to be asked, although objected to, is not a reversible error, when the record does not show that it was answered.

APPEAL from the City Court of Montgomery.

Tried before the Hon. JOHN A. MINNIS.

This action was brought by Flash Brothers, a mercantile partnership, doing business in New Orleans, against Loeb & Brother, a mercantile partnership doing business in Montgomery, to recover damages for the conversion of five hogsheads of sugar and ten barrels of molasses; and was commenced on 27th January, 1879. The case was tried on issue joined on the plea of not guilty. The goods sued for were shipped by plaintiffs, from New Orleans, on or about the 26th November, 1878, consigned to Munter & Brother, another mercantile firm doing business in Montgomery; and the defendants claimed to have purchased them from said Munter & Brother, and received them on their arrival in Montgomery. The plaintiffs read in evidence on the trial the deposition of William Flash, one of the partners in their firm, who, in answer to interrogatories asking whether he had "ever had any transaction on account of his firm with M. Munter, of Montgomery," and to state all that occurred at the time, thus testified: "I did [have a business transaction with said Munter], on the 26th November, 1878. I acted in behalf of my firm, and Munter acted for his firm, Munter & Brother. He called at the office of my firm, on the evening of November 25th, introducing himself as Mr. Munter of Montgomery, and desiring to purchase a bill of goods. I asked him, in the course of conversation, if he was the Munter formerly of Munter & Faber, of Montgomery; to which he replied, that he was not. He asked, what were our terms of sale; to which I replied, that to satisfactory parties we gave thirty or sixty days' credit, according to the style of goods. I asked him for his references, and he gave the name of Farley, Spear & Co., bankers in Montgomery, and requested me to telegraph to them, stating that he would call again in the morning. I telegraphed, as requested, asking the standing of Munter Brothers. He called the next morning, but my firm had as yet received no reply. He proposed to look at some goods, and make some selections, subject to our future approval; which he did, and his order

was taken down, with the understanding that, if his refer-
ences were satisfactory, the goods would be shipped. He then
left, and we saw nothing more of him.  Subsequently, we
received a telegram from Farley, Spear & Co., and also from
Josiah Morris & Co. (bankers in Montgomery, to whom we
had also telegraphed); and their replies not being satisfac-
tory, we declined to ship the goods, and so instructed our
clerk; but it was discovered that those specified in the ex-
hibit hereto attached," being the goods now sued for, "had
been inadvertently sent to the railroad depot for shipment.
We immediately directed the railroad company not to for-
ward the goods, and advised Munter of our refusal to fill his
order on the terms that had been spoken of.  Before we had
time to haul the goods back to our store from the railroad
depot, the railroad company had sent them forward to
Montgomery, notwithstanding our instructions not to do so.
The goods so shipped were to have been sold on thirty days'
credit.  Munter advised us of their receipt, and directed us
to draw at thirty days; which we did, as the goods had
gone; and 'Exhibit M,' hereto attached, is the draft which
we drew, and which was accepted.  Though dated the 26th
November, it was made up on December 6th, and was ante-
dated.  As it was, the goods were sent through error.  My
firm has not been paid for the goods, nor have they been
returned to us."  The draft, as shown by the exhibit, was
indorsed, "*Flash Bros.*"  "Pay to the order of Josiah Mor-
ris & Co., for collection on account Hibernian National
Bank," signed "*Jno. G. Devereaux,* cashier."  The letter re-
ferred to is dated November 27th, 1878, addressed to Mun-
ter & Brother, at Montgomery, and in these words: "We
regret to say that, after the departure of your Mr. M., the
information we received was not sufficiently satisfactory to
enable us to fill your order upon the terms proposed.  For
such acceptance as we can use, will be glad to execute your
orders."

  "Plaintiffs then proposed to prove by Mr. Jones, book-
keeper of J. W. Hardie & Co., merchants in Montgomery,
that on and prior to the 26th November, 1878, Munter &
Brother were insolvent, or in a failing condition; to which
evidence defendants objected," and excepted to its admis-
sion.  "Plaintiffs asked said witness, 'whether said Hardie
& Co. held any claims, checks or bills on M. Munter &
Brother, in the fall of 1878, and whether they were paid at
maturity'; to which he answered, that M. Munter &
Brother bought several bills of said house during Septem-
ber, 1878, and gave their check on the P. & M. National
Bank in the city, payment of which was refused upon pre-

sentment." The defendants objected to this question and answer, each, and reserved exceptions to the overruling of their objections. " Other matters, of the same character, were testified to by witness, as occurring in the fall of 1878; to all of which defendants objected, and excepted to the overruling of their objections. All of said checks were subsequently paid, except one for $147.30, which fell due towards the middle of October. One May, a witness for plaintiffs, a merchant in Montgomery, testified that M. Munter & Brother bought a lot of cotton from him in September, 1878, and gave in payment their draft on the P. & M. National Bank in Montgomery, at thirty days; that they came to him, at the maturity of the check, stated that they were unable to meet it, offered to pay him a part, and asked him to withdraw the check and wait for the balance; that he (witness) agreed to this, and that the balance is still unpaid, amounting to several hundred dollars. Defendants objected to this testimony of said witness," and excepted to its admission. " These witnesses, and R. Goldthwaite, cashier of the P. & M. National Bank, testified that checks given by said Munter & Brother, in September and October, 1878, were refused and ' thrown out ' by the bank, and are still unpaid; to all of which evidence the defendants objected," and reserved exceptions to its admission. " Mr. Cameron, clerk of Josiah Morris & Co., bankers in Montgomery, testified as to the payment or non-payment of notes and bills on M. Munter & Brother, left in their office for collection, extending from the 14th to the 27th November, inclusive, 1878, all of which were paid, except one falling due on the 14th November; also, as to the payment or non-payment of notes and bills left with said banking-house for collection, falling due on the 4th, 5th, 7th, 9th and 10th December, 1878, most of which were extended, or refused payment, or withdrawn, but none protested." The defendants objected to each part of this evidence, as it was offered, and reserved exceptions to its admission.

" Plaintiffs offered in evidence a transcript of the record of judgments confessed by M. Munter & Brother on the 20th December, 1878, one in favor of Lehman, Durr & Co., for $4,800, and one in favor of J. Abraham & Brother, for $1,575; to which evidence defendants objected," and excepted to its admission. " Plaintiffs were permitted to prove, against defendants' objection, that executions on said judgments were put in the hands of the sheriff on the 20th December, 1878; to which defendants excepted. The witness, who was the deputy-sheriff, who had the executions in his hands, was asked by plaintiff, if he had exhausted every effort to make

the money on these executions; to which question defend-
ants objected, the court overruled their objection, and they
excepted."

"Plaintiffs offered to prove by L. A. Shaver, that he was
attorney for Peters & Co. in a suit brought by them to re-
cover of the defendants in this action certain tobacco which
Munter & Brother had bought, on thirty days' credit, from
said Peters & Co., merchants in Virginia; which suit was
commenced on the 23d December, 1878, in the Circuit Court
of Montgomery; and in which said defendants testified that
they bought said tobacco from Munter & Brother before its
arrival in Montgomery, and paid for it only what they, the
said Munter & Brother, had agreed to pay for it in Virginia,
not including cost of transportation to Montgomery. It was
in evidence, also, that the price allowed by defendants to
said Munter & Brother, for the sugar and molasses here
claimed by plaintiffs, was its New Orleans invoice price,
which was allowed by defendants entering a credit for that
amount on the account held by them against Munter &
Brother. To this evidence, and also to the testimony of
said Shaver, defendants objected, but the court overruled
their objections, and they excepted." "Another witness for
plaintiffs, an attorney, was asked this question : ' Have you
any claims in your hands against M. Munter & Brother? if
so, what is their amount, when contracted, and when due?
To this question the defendants objected," and duly excepted
to its allowance by the court. "Said witness testified, against
the defendants' objection, that he had two claims against
said Munter & Brother, for about $1,800, contracted August
15th, 1878, which came into his hands in December, 1878,
and were past-due and still unpaid : to which ruling of the
court, admitting said evidence, defendants excepted. Another
witness for plaintiff was permitted to testify as to the insol-
vency of said Munter & Brother, against the objection of
defendants, and stated, on cross-examination, ' I know it
from having claims, and from admissions made in January,
or February, 1879.' The defendants then moved to exclude
from the jury said testimony in reference to insolvency," and
excepted to the overruling of their motion.

"Plaintiffs introduced one Cunningham as a witness, who
was their travelling agent, and who testified that he was in
Selma, Alabama, on the 24th or 25th December, 1878, when
he received from plaintiffs a telegram to go to Montgomery,
to see about matters of M. Munter & Brother; that he came
to Montgomery on 25th December, and found the store of
Munter & Brother closed, and in the hands of the sheriff;
that he was informed the sugar and molasses, the subject of

this suit, had been sent from the railroad depot in Montgomery directly to the defendants' store ; that he called upon defendants, who, upon his first visit, declined to acknowledge that they had ever received the sugar and molasses, stating, in reply to his inquiries, that they did not know whether they had received it or not from M. Munter & Brother ; but that, on a subsequent call upon them, an hour or two later, they stated that they had the sugar and molasses, that it was their property, and that they had paid their money for it. Witness testified that he, as the agent of plaintiffs, made a demand upon defendants for the sugar and molasses, which was refused ; that the sugar claimed was, at the time of the trial, worth one cent per pound more than invoice price, as shown in plaintiffs' account attached to the deposition of Flash, and that the molasses was worth ten cents per gallon more at the time of the trial.

" It was in evidence, also, that plaintiffs offered to return to said Munter & Brother their acceptance given in payment for said sugar and molasses, before suit was commenced against these defendants ; also, that defendants did business in Montgomery, on the same street, and on the same block with said Munter & Brother, at and before the time of these various transactions between them, and that they were on friendly terms ; also, that defendants received the goods directly from the railroad depot in Montgomery, and were to credit Munter & Brother for them on their account, at their invoice price. One of the defendants testified, that said Munter & Brother were indebted to defendants in a considerable amount, for groceries, bagging, ties, &c., in which the defendants were regular dealers ; that said defendants were pressing them for payment ; and that there was a balance still due to defendants from said Munter & Brother, after they had been credited with the amount allowed for the said sugar and molasses. The deputy-sheriff, Boothe, plaintiffs' witness, was permitted to testify, against the defendants' objection, that after the executions against Munter & Brother were put in his hands, he found at the store of Pollak & Co. boxes of goods with the name of M. Munter & Brother partially erased, but enough remained to make it appear that the name attempted to be erased was that of Munter & Brother ; and the defendants excepted to the action of the court in admitting this evidence. It was shown by plaintiffs also, upon cross-examination of Munter, witness for defendant, that within a few months after the confession of said judgment by Munter & Brother, in favor of Lehman, Durr & Co., a store was opened near the defendants' store, in and by the name of B. Munter, wife of said

witness Munter, recently of the firm of M. Munter & Brother; that said Munter was a clerk in said store of his wife; that defendants were selling them goods and supplies on a credit; and that said establishment of B. Munter was still open, and managed by said Munter. It was proved, also, that the Munter who was in New Orleans, was not the Munter of Munter & Faber."

"This was, substantially, all the evidence in the case; and the court thereupon charged the jury, among other things, that although M. Munter & Brother may have been indebted to the defendants, such indebtedness was not such a valuable consideration as to constitute the defendants purchasers for a valuable consideration of the goods in controversy. To this charge the defendants excepted," and also to each of the following charges, which were given by the court on the request of the plaintiffs:—

"1. It is a fraud in law, for one merchant, being insolvent, to obtain goods from another merchant under the pretense of a purchase, not intending at the time or expecting to be able to pay for the same; and the merchant thus defrauded has the right to claim the goods so obtained from him, in the hands of the purchaser, or in the hands of one to whom the purchaser delivered them in part satisfaction of an existing indebtedness.

"2. If the original purpose of Munter & Brother was to obtain the goods in controversy without paying for them, and, with like intent, they authorized plaintiffs to draw on them, and accepted the bill of exchange read in evidence; then, the plaintiffs, by taking said bill of exchange, if they were ignorant of said fraudulent purpose, were not thereby estopped or debarred of their right, on discovering the fraud attempted to be perpetrated on them, to reclaim the goods so obtained from them.

"3. If the jury find, from the evidence, that though plaintiffs took the acceptance of Munter & Brother, in payment of the goods in controversy, after the goods had passed from the plaintiffs' possession into the possession of Munter & Brother, yet, at the time of said acceptance, they had no knowledge of Munter & Brother's insolvency, or intention on their part not to pay for the goods; then, this taking of the note of Munter & Brother will not amount to a waiver of any fraud that may have been practiced upon them, the said plaintiffs, or a ratification of the contract.

"4. If the jury believe, from the evidence, that Munter & Brother were in failing circumstances at the time they got the goods from plaintiffs, and knew themselves to be so, and gave their acceptance at thirty days, in payment for said

goods, with no reasonable expectation or intention at the time of paying for them; and that plaintiffs dealt with them in good faith, and without knowledge of the circumstances of Munter & Brother; then, the conduct of Munter & Brother was a fraud upon these plaintiffs, which rendered the contract voidable at the election of said plaintiffs, seasonably expressed, and gave them the right to rescind the contract and demand the goods.

" 5.    If Munter & Brother got no title, by reason of a fraud upon Flash Brothers, then Loeb & Brother, who bought from them, took no better title than Munter & Brother had, unless they show that they purchased for value, and without notice of any facts or circumstances to put them upon inquiry in regard to the defect of Munter & Brother's title to the goods.

" 6.    If the jury believe, from the evidence, that the goods were shipped by plaintiffs, at New Orleans, to M. Munter & Brother, at Montgomery, by mistake, and not pursuant to a purchase and sale of them; and, after the arrival of the goods at Montgomery, Munter & Brother, being then insolvent, and not intending or expecting to be able to pay for them, took possession of the goods, and wrote to plaintiffs to draw for the amount at thirty days; and that plaintiffs, being ignorant of the insolvency of Munter & Brother, and of their intention not to pay for the same, drew the bill of exchange read in evidence, and took the same after acceptance by Munter & Brother; then, the taking of such bill of exchange did not estop or debar plaintiffs, on discovering the fraud perpetrated upon them, from reclaiming the goods from Munter & Brother; or from the defendants, if they obtained the goods from Munter & Brother in part satisfaction of an existing debt.

" 7.    If the jury believe, from the evidence, that the goods were obtained from plaintiffs, by Munter & Brother, by fraud; and that the bill of exchange read in evidence was accepted by Munter & Brother for the price of the goods; and that plaintiffs negotiated the said bill of exchange before discovering the fraud perpetrated upon them, and afterwards took up the same, and it has not been paid by Munter & Brother; then, the negotiation of said bill of exchange would not estop or debar plaintiffs of their right, after discovering the fraud, to reclaim the goods in the hands of Munter & Brother, or in the hands of defendants, if they obtained the same from Munter & Brother in part satisfaction of an existing indebtedness.

" 8.    If the jury find, from the evidence, that the plaintiffs are entitled to recover, the measure of their recovery is the

value of the goods ; and if the jury believe, from the evidence, that the sugar is now worth one cent per pound more, and the molasses ten cents per gallon more, than the price stated in the account attached to the deposition of Flash, this additional value should be added to the value stated in said account, and their verdict should be for the whole sum thus ascertained.

" 9.   If the jury believe, from the evidence, that the goods in controversy were obtained from the plaintiffs in the manner stated in the deposition of Flash, and that when Munter & Brother applied to purchase the goods, they were in fact insolvent, and did not expect or intend to pay for the goods ; and that with like intent, after the arrival of the goods at Montgomery, Munter & Brother wrote to plaintiffs, authorizing them to draw for the amount of the goods ; and that the plaintiffs, having no knowledge of said intent of Munter & Brother not to pay for the goods, drew the bill of exchange read in evidence, and said bill was not paid at maturity by Munter & Brother ; then, plaintiffs had the right, within a reasonable time after discovering the fact that said goods were obtained from them fraudulently, as aforesaid, to reclaim the goods from Munter & Brother, or from these defendants, if the proof shows that they obtained the goods from Munter & Brother in part satisfaction of an existing indebtedness."

The defendants excepted to each of these charges, and also to the charge given by the court of its own motion ; and they then requested numerous charges, twenty in all, which the court refused to give ; and to the refusal of each they duly excepted.   As the court does not pass upon the correctness of these charges in detail, and the legal points involved appear from the charges given, it is not necessary to state them.

The several rulings of the court on the evidence, the several charges given, and the refusal of the charges asked, are now assigned as error.

SAYRE & GRAVES, and WATTS & SONS, for appellants.—This case does not fall within the principle stated by the Supreme Court of the United States, in *Donaldson v. Farwell*, 93 U. S. 633.   To come within that principle, there must be—1st, an attempt to buy on credit, with the intent not to pay ; 2d, the purchaser must be insolvent ; 3d, a sale, as the result of the attempt ; 4th, a fraudulent concealment of the insolvency, and of the intent not to pay ; 5th, the vendor must have been induced to sell by such fraudulent concealment.   It is not pretended that Munter was guilty of any active, affirmative

[Loeb & Bro. v. Flash Brothers.]

fraud, since he made no representations whatever ; and fraud can not be implied from his silence, since he was not asked or allowed to speak.  He was notified in advance, by the demand for a reference, that his ability to buy goods depended, not on what he might say for himself, but on the response of the referee.  This enforced silence can not be construed as a fraudulent concealment on his part.—Benjamin on Sales, 314–15 ; *Van Arsdale v. Howard*, 5 Ala. 596. Nor was there any sale, or any other act on the part of Flash Brothers, induced by any thing said or done by Munter while in New Orleans.  The testimony of Flash himself, the only witness examined as to the transaction, clearly shows that the proposal of Munter was rejected, and purposely rejected, after receiving unfavorable reports from Montgomery ; and the letter of Flash Brothers, of November 28, is to the same effect.  But a part of the goods, the part now sued for, had already been shipped, either by mistake of their own clerk, or, in violation of instructions, by the railroad ; and " as the goods had gone," though " sent in error," they drew on Munter & Brother for the price, and their draft was accepted and returned, according to their instructions.  This is the only sale disclosed by the evidence, and it was consummated in Montgomery, when the draft was returned.  It was an independent transaction, having no connection with anything said or done by Munter in New Orleans.  It originated in a mistake, for which Munter was not in any way responsible, and with which he had no agency : he simply accepted the proposition made to him by Flash Brothers.  This was done, too, with full knowledge of all the facts, when they might have recovered the goods shipped by mistake, or sued the railroad company for damages.  Even if the goods had been obtained by fraud, this would have been a waiver of the fraud, and an affirmance of the contract.— *Gilmer v. Ware*, 19 Ala. 258 ; 2 Hilliard on Torts, 144 ; Benjamin on Sales, 319.  The title to the goods having passed to Munter & Brother, the appellants are entitled to protection as innocent purchasers for value.—*Crawford v. Kirksey*, 55 Ala. 282.  If the appellants were innocent purchasers, all the evidence which was admissible only on the ground of fraud, was irrelevant and illegal.—*Allen, Bethune & Co. v. Maury & Co.*, at the present term ; *Johnson v. Br. Bank*, 7 Ala. 379.

Aside from all other questions, the charge of the court as to the measure of damages must work a reversal.—*Jenkins v. McConico*, 26 Ala. 246.

E. P. MORRISETT, and D. S. TROY, *contra.*—1.  The facts show that Munter & Brother were insolvent when they pur-

chased the goods now in controversy, and knew themselves to be insolvent. They bought on thirty days' time, not intending to pay for the goods; and Flash Brothers dealt with them in good faith, in ignorance of their insolvency, and with no reasonable means of ascertaining it. These facts alone, without any active artifice or misrepresentation on the part of Munter & Brother, constitute a fraud on Flash Brothers, vitiating the contract of purchase, and rendering it voidable, at their election, seasonably expressed. This proposition is abundantly sustained by the highest judicial authority, both in England and in this country.—*Noble v. Adams*, 7 Taunton, 59; Benjamin on Sales, 1st ed., 321–2; *Donaldson v. Farwell & Co.*, 93 U. S. 633; *Powell v. Bradlee*, 9 G. & J. (Md.) 221; *Talcott v. Henderson*, 31 Ohio, 162; *Durell v. Haley*, 1 Paige, 492; *Lupin v. Marie*, 2 Paige, 169; Hilliard on Contracts, vol. 1. p. 332.

2. Loeb & Brother, receiving the goods from Munter & Brother, directly from the railroad depot in Montgomery, at New Orleans invoice price (Munter & Brother paying the freight), as a credit upon an antecedent debt by open account, upon which they had been pressing Munter & Brother for payment, can not be regarded as innocent transferrees. Hill. Contracts, vol. 1, p. 331; Bump on Fraud. Conv. 483; *Pringle v. Phillips*, 5 Sandf. N. Y. 157; *Root v. French*, 13 Wendell, 570; *Powell v. Bradlee*, 9 G. & J. (Md.) 278; *Loeb & Bro. v. Peters*, 63 Ala. 243; *Butler v. Harrison*, Cowp. 565; *Barnard v. Campbell*, 58 N. Y. 73.

3. It is no reply to the allegation of fraud in the transaction, that Munter did not succeed in carrying out his fraudulent design in the city of New Orleans. In view of the evidence, the fallacy of this argument is apparent. The event shows that Munter did accomplish his object—did overreach Flash Brothers, and got possession of the goods he sought to get, within a few days after his return from that city. That the fraud was not consummated on the first day he attempted it, does not change the character of the transaction, or convert the fraud into an honest purchase. Nor does the draft drawn by Flash Brothers amount to a confirmation of the fraud.—Bigelow on Fraud, 185; Kerr on Fraud and Mistake, 296; *Morse v. Royal*, 12 Vesey, 373.

4. There was no error in the admission of the testimony of Shaver and others, to show a conspiracy between Munter & Brother and Loeb & Brother, by proof of other transactions of like character, occurring about the same time, to defraud strangers; Munter & Brother purchasing on a credit, and Loeb & Brother receiving the goods as fast as they arrived, on an account held by them against Munter

& Brother, who, immediately afterwards, confessed judgments for a large amount, and retired from business.—*Snodgrass v. Branch Bank*, 25 Ala. 161 ; 115 Mass. 514.

5. There is no error in the charge as to the amount of damages the plaintiffs were entitled to recover. The only evidence of the value of the goods was their value at the time of the trial. If defendants objected to that value, they should have offered other evidence. As wrong-doers, they can not complain.—*Johnson v. Marshall*, 34 Ala. 522. If they regarded the charge as too explicit, or inexplicit, they should have asked explanatory or additional charges.—*Magee v. Billingsley*, 3 Ala. 703. Charges must be construed in connection with the evidence ; and if, when thus construed and applied, they are correct, though erroneous as universal propositions, they do not warrant a reversal.—32 Ala. 126.

6. Having indorsed the bill to the Hiberian Bank, Flash Brothers became liable on their indorsement for its payment ; and having it in their possession after maturity, the presumption is that they paid it.—*Dugan v. United States*, 3 Wheaton, 172 ; 2 Wallace, 121 ; *Mayberry v. Morris*, 62 Ala. 117.

STONE, J.—In instructing the jury as to the measure of damages in this case—an action of trover—the City Court used the following language : "If the jury believe from the evidence that the sugar is worth now one cent per pound more, and the molasses ten cents per gallon more, than the prices stated in the account attached to the deposition of Flash, this additional. value should be added to the value stated in said account, and their verdict should be for the whole sum thus ascertained." The prices stated in the account were the proximate value of the goods, when they went into the possession of the defendants. A wrongful conversion of the goods of another does not divest the title of the owner, or clothe the wrong-doer with a right or title in the thing converted. A suit and judgment for the plaintiff works no change of ownership. Payment of a judgment thus recovered consummates the transfer, and vests the title, from that time, in him who has converted it.—1 Addison on Contracts, 441–2 ; *Firemen's Ins. Co. v. Cochran*, 27 Ala. 228 ; 2 Brick. Digest, 488, § 13. The right of property remaining in the plaintiffs all through the pendency of the suit, every moment the chattel was detained wrongfully from them was itself a conversion ; and hence a large latitude is allowed in fixing the precise time of the wrongful act. Out of this grew the principle, that in assessing damages the jury had the entire latitude between the first act of conversion and the

trial. The rule is thus stated in *Jenkins v. McConico*, 26 Ala. 213: "The true measure of damages, in an action of trover, where the thing converted has a fixed value, is that value at the time of conversion; and the jury may give interest upon it. If the value is fluctuating, the jury may take its highest value at any time between the conversion and the trial."—See, also, *Strong v. Strong*, 6 Ala. 345; *Tatum v. Manning*, 9 Ala. 149; *Lee v. Matthews*, 10 Ala. 688; *Ewing v. Blount*, 20 Ala. 694.

There are strong reasons for leaving this question discretionary with the jury. First: Trover is, to some extent, an equitable action, and many circumstances may enter into the transaction, requiring either full damages, or mitigating defendant's conduct and consequent liability to simple compensation.— *Williams v. Crum*, 27 Ala. 468; *Lee v. Matthews*, 10 Ala. 682; *Gray v. Cochran*, 8 Port. 191; *Conner v. Allen*, 33 Ala. 515; *Dent v. Chiles*, 5 St. & Por. 383. Second: Conversions are sometimes willful and wanton; while at other times they are innocently perpetrated, by becoming the ignorant bailee or receiver of goods, which had been converted by another. These varying phases of the question render it eminently proper that juries should be clothed with a discretion, in determining whether they will give to plaintiffs the benefit of a rise in the value of the chattel sued for, which took place after the first act of conversion. We adhere to the rule declared in *Jenkins v. McConico*, both because it has been a long-settled rule in this court, and because we approve it in principle. The City Court erred in the charge copied above.

As what we have said above necessarily workes a reversal of this case, we propose, in the farther progress of this opinion, to notice only the questions which we think should enter into the second trial. We do not propose to consider all the questions in detail. There appears to be no controversy, or contrariety of opinion, as to the right of Flash Brothers to maintain the action of trover, if the suit were against Munter Brothers, provided Munter Brothers obtained the goods, when they were insolvent, or in failing circumstances, with no intention or reasonable expectation of paying for them, and without disclosing their condition, or furnishing the means of such information to Flash Brothers. We think this a sound principle—sound alike in law and in morals—and we adopt it as a necessary safeguard in commercial dealings. In *Donaldson v. Farwell*, 93 U. S. (3 Otto) 631, the principle is thus stated: "The doctrine is now established by a preponderance of authority, that a party not intending to pay, who . . induces the vendor to sell

him goods on credit, by fraudulently concealing his insolvency and his intent not to pay for them, is guilty of a fraud, which entitles the vendor, if no innocent third party has acquired an interest in them, to disaffirm the contract, and recover the goods." And in a note to section 440, Amer. ed., of Benjamin on Sales, it is said, this rule prevails when the purchaser did not intend to pay, "although there were no fraudulent misrepresentations, or false pretenses." Very many authorities are cited in support of this proposition; but there are respectable authorities the other way.—See, also, the numerous authorities cited on the briefs of counsel. The principle we are discussing is of rather modern growth, but it is a growth upward in commercial morals. No greater wrong could be inflicted on a wholesale dealer, than for an insolvent buyer to obtain his merchandise on credit, without intention or means to pay for them, and without disclosing his true condition to the seller. We are content, however, to leave the principle as we have stated it above.

It is contended for appellants that the principle stated above does not apply to this case, because Munter made no false representations of his solvency—in fact, made no representations at all; that he was not interrogated as to his financial condition, and therefore committed no fraud, either by false statement, or by concealment; that he was asked for a reference, gave a reliable one, and the response of the referee was unsatisfactory. What they contend is, that with full knowledge of the commercial standing of Munter Brothers—knowledge obtained from their own correspondent, as well as from the referee furnished—Flash Brothers, choosing between evils, concluded to take the risk, as to the goods which had been shipped to Montgomery through mistake, and therefore made the sale with full knowledge they were extending credit to an unreliable house. In connection with, and support of this proposition, it is claimed that no sale was made to Munter Brothers until after the goods reached Montgomery.

The facts of this case, in brief, are, that Flash Brothers were merchants in New Orleans, doing business as "wholesale grocers, general commission and produce merchants." Munter Brothers and Loeb & Brother were each mercantile firms, doing business in Montgomery, their stores and places of business being in said city. On the 26th and 27th November, 1878, Munter Brothers applied to Flash Brothers to purchase merchandise on thirty days' time, their credit rates of sale. Flash Brothers required a reference, and Farley, Spear & Co., bankers in Montgomery, were given as referees. Flash Brothers inquired of Farley, Spear & Co., by

telegram, and, on the 27th November, received a reply which was not satisfactory. They immediately wrote to Munter Brothers that they could not fill their order, without such acceptance as they, Flash Brothers, could use. By some mistake, however, part of the goods ordered had been shipped to Munter Brothers at Montgomery. This shipment could not have been earlier than the 27th. The letter of Flash Brothers, declining to fill the order, was probably received by Munter Brothers before the goods arrived, as mail trains notably out-travel freight trains. We are not informed by the record when the letter was received, or when the goods arrived. After the goods arrived in Montgomery, date not given, Munter Brothers wrote Flash Brothers, informing them of their arrival, and directing them to draw on them at thirty days. Flash testifies he did this, "as the goods had gone." The letter inclosing this draft is dated December 6th, 1878 ; and we suppose this was soon after the receipt of Munter's letter, giving notice of the receipt of the goods. The writing and mailing of this letter, December 6, must be treated as the consummation of the contract; it was then their two minds came together. All before that was negotiation. The argument here made is, that inasmuch as Flash Brothers, before they agreed to treat the transaction as a sale, had full information and warning of the commercial standing of Munter Brothers, they could not be, and were not defrauded.

If this case stood alone on the facts summarized above, we would be inclined to agree with appellant's counsel ; at least, in the absence of facts and circumstances tending to show to the jury that, at the time of making the purchase, Munter Brothers, being insolvent, either did not intend to pay for the goods, or had no reasonable expectation of doing so. Of course, what their intentions, or reasonable expectations were, could rarely be the subject of positive proof. These inquiries would rest with the jury, on a proper weighing of all the facts and circumstances in evidence. But, on the trial of this case, it was shown that, at and before the arrival of the goods in Montgomery, Munter Brothers were considerably indebted to Loeb & Brother by account, which the latter were pressing for payment; and that when the goods arrived, they were not carried to the store of Munter Brothers, but were carted directly from the railroad to the store of Loeb & Brother, and placed therein as the merchandise of the latter. A credit was allowed and entered on the outstanding account of Munter Brothers by Loeb & Brother, for the amount of the original cost of the goods, but no credit was allowed for the expense of railroad transportation. Cunningham, agent of Flash Brothers, who visited Montgom-

ery December 25th, to look after the interest of his employers growing out of this transaction, testified, "that he received information that the sugar and molasses [the articles bought] had been sent from the railroad depot in Montgomery, directly to the store of defendants, Loeb & Brother; that he called upon defendants, who declined, upon his first visit, to acknowledge that they had ever received the sugar and molasses; stating, in response to his inquiries, that they did not know whether they had received it or not from M. Munter & Brother; but that upon a subsequent call upon them, an hour or two later, they stated they had the sugar and molasses, that it was their property, and that they had paid their money for it." The testimony does not inform us whether, at the time Munter Brothers wrote Flash Brothers the goods had arrived, they had been carted from the depot to the store of Loeb & Brother, or whether the removal was made afterwards. The fact, however, that they were never carried to the store of Munter Brothers, but went directly to the store of Loeb & Brother, tends to show that at, or before their arrival, it was agreed or understood that they should be so delivered, and thus used in part liquidation of the account of Munter Brothers with Loeb & Brother. On such testimony, if believed, and not rebutted, a jury would feel authorized to find there had been such agreement, dating back at least to the time of the arrival of the goods, if not to an earlier date.

When a retail merchant buys in quantity from a wholesale dealer, the ostent of the transaction is, that he buys to sell again in the regular course of his business. The profits of his enterprise consist in the sum of his sales, less the cost of his merchandise and the expense of the business. If, at his own expense of time and money, he visit a distant mart, and there purchase goods, ship them, and, before receiving them actually into his possession, sell them to another merchant at cost, making no charge for transportation, it needs no calculation to show that this is a losing business. Legitimate time-purchases by merchants are ordinarily made on the expectation, in part, that by sales of the merchandise the purchaser will put himself in funds, with which to pay his own debt contracted in the purchase. If, instead thereof, he dispose of them in gross to another merchant, not at profit, but at a loss,—not for money, but in payment of an antecedent debt; and if he is at the time in failing or insolvent circumstances, this, unexplained, tends to show that he did not intend or expect to pay for the goods.

We state the following as legal principles applicable to the testimony bearing on the question of sale by Flash

Brothers to Munter Brothers, and the sale by the latter to Loeb & Brother. The jury should have been instructed to inquire, first, whether at the time of the purchase, Munter Brothers intended, or expected to be able, to pay for the goods ; second, whether Munter Brothers, before they wrote, informing Flash Brothers of the arrival of the goods, had sold, agreed to sell, or determined to turn over the goods to Loeb & Brother, and whether the goods were in fact delivered directly to Loeb & Brother from the railroad depot; third, whether, at the time of the purchase, Munter Brothers were insolvent, or in failing circumstances. If these three propositions be found by the jury, the first negatively, and the other two affirmatively, then it was a fraud on Flash Brothers, if Munter Brothers so purchased and received the goods, without informing them of the disposition they had made, or intended to make of the goods, to Loeb & Brother; which fraud would authorize Flash Brothers to renounce the sale, and sue in trover for the goods. Such fraud would render the contract voidable, at the option of Flash Brothers, seasonably expressed.

It is contended, however, that Loeb & Brother are innocent purchasers, and that this suit can not be maintained against them. Merely entering a credit on an account past due, without surrendering any thing valuable, would not, under any circumstances, constitute them *bona fide* purchasers, so as to defeat an action such as this. But we go farther. Receiving the goods under the circumstances the testimony tends to prove, and on the terms this record discloses, was such a wide departure from the ordinary methods of mercantile transactions, as to put Loeb & Brother on inquiry into the circumstances attending Munter Brothers' purchase, and charges them with notice of all information which legitimate and faithful inquiry would have led to. They can claim nothing on the alleged ground of *bona fide* purchase.

It is contended for appellants, that the City Court erred in allowing evidence to be given of other transactions about that time between Munter Brothers and Loeb & Brother. We do not think the City Court erred in this. There was testimony before the jury, sufficient to raise the inquiry by that body, whether or not there was a common purpose or conspiracy between Munter Brothers and Loeb & Brother, to obtain the merchandise from Flash Brothers, with no intention or expectation of paying for them. On questions of conspiracy, when enough has been shown to authorize the jury to pass on it, the rules for the introduction of evidence are very liberal. The acts of each conspirator become

[Long v. Mostyn.]

the acts of all. We think a sufficient predicate had been laid in the unusual features of this transaction, to justify inquiry into other dealings between these parties, had about the same time.—1 Greenl. Ev. § 111; *Freeman v. Scurlock*, 27 Ala. 407. Great latitude is also allowed, in proving the fact of insolvency.—*Graham v. Lockhart*, 8 Ala. 9.

A question asked witness Boothe was objectionable. *Tanner v. Louisville & Nashville Railroad*, 60 Ala. 621. It is not shown, however, that this question elicited any answer. *Rupert v. Elston*, 35 Ala. 79. We do not find any error in the admission of evidence, unless Boothe gave evidence in answer to the question noticed above.

There is nothing in the objection made, that Flash Brothers, soon after receiving the accepted draft on Munter Brothers, indorsed and transferred it to Hibernia National Bank. An act like this, to constitute ratification, must be done with knowledge of the facts which constitute the fraud. There is no evidence that Flash Brothers knew the goods, on their arrival, went immediately into the possession of Loeb & Brother, until their agent visited Montgomery, December 25th.—*Thompson v. Lee*, 31 Ala. 292; *Foster v. Gressett*, 29 Ala. 393; 1 Lead. Cases in Eq., 4th ed., 833, *et seq.*; Bigelow on Fraud, 184. When Flash Brothers received the draft back from the bank, and again became the owners of it, their rights were re-instated, as if they had never negotiated the paper.—*Bankhead v. Owen*, 60 Ala. 457.

Reversed and remanded.